A. Maschmeijer, Jr., Inc. *v.* United States (No. 4674)[1]

United States Court of Customs and Patent Appeals, January 29, 1952

*John D. Rode* for appellant.

*Charles J. Wagner,* Acting Assistant Attorney General (*Richard F. Weeks* and *Alfred A. Taylor, Jr.,* special attorneys, of counsel), for the United States

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges

O'CONNELL, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, rendered pursuant to its decision, C. D. 1292.

The judgment appealed from overruled the protest of appellant claiming that certain dementholized cornmint oil imported from Brazil was properly dutiable at 12½ per centum ad valorem as a distilled or essential oil, not specially provided for, under paragraph 58 of the Tariff Act of 1930, as amended by the French Trade Agreement, T. D. 48316, and not as peppermint oil, as classified and assessed with duty

by the collector at the port of New York, at 25 per centum ad valorem under the *eo nomine* provision therefor in paragraph 58, which provision had not been amended by the trade agreement.

The provision for peppermint oil in the present tariff act has been included in every tariff act since 1890. No cases have been cited here, however, with reference to the judicial interpretation of that provision.

The involved paragraph reads as follows:

Par. 58. Oils, distilled or essential: Lemon, grapefruit, and orange, 25 per centum ad valorem; eucalyptus, 15 per centum ad valorem; clove, peppermint, patchouli, sandalwood, and all other essential and distilled oils not specially provided for, 25 per centum ad valorem; *Provided*, That no article mixed or compounded with or containing alcohol shall be classified for duty under this paragraph.

As modified by the French Trade Agreement, T. D. 48316, paragraph 58 reads:

Oils, distilled or essential: Clove, patchouli, sandalwood, and all other essential and distilled oils not specially provided for, not containing alcohol, 12½% ad val.

The importer and Government counsel at the trial each called two witnesses. Their testimony was also supplemented by physical and documentary exhibits. Government reports, which included the Summary of Tariff Information, 1929, dictionary definitions, excerpts from the Encyclopedia Britannica, numerous authorities on applied chemistry, together with other technical works concerning oils, their origin, characteristics, and uses were introduced in evidence or cited by counsel.

The importer had the two-fold burden of proving not only that the classification and assessment of duty as made by the collector were erroneous but also that its own affirmative claims and contentions were correct.[1]

The court in its decision acknowledged that the two oils in issue were separate and distinct, each being derived from a different species of the plant or genus "mentha," or mint; that while each species had certain permanent characteristics of the group in common, the oil derived from the plant *Mentha piperita*, raised principally in the United States, but also in other countries, is the true peppermint oil, botanically and universally recognized as such; and that it is used as a flavoring agent for medicine, confectionery, chewing gum, liqueurs, toilet articles, and fine pharmaceuticals.

The trial court likewise recognized from the situation presented by the record that the cornmint oil derived from the plant *Mentha arvensis*, once raised principally in Japan, but also experimentally in the United States, is not recognized as peppermint oil in the United

[1] *United States* v. *Gardel Industries*, 33 C. C. P. A. (Customs) 118, C. A. D. 325; *Joseph E. Seagram & Sons, Inc.* v. *United States*, 30 C. C. P. A. (Customs) 150, 157, C. A. D. 227.

States Pharmacopoeia, and that Japanese mint oil·has been used almost exclusively for making menthol.

The importer also developed the fact in the record that Japanese immigrants who migrated to Brazil near the end of the year 1939 started growing and processing the plant *Mentha arvensis* there and the resulting product and its exportation to the United States has reached large proportions.

The testimony given by the vice-president of appellant corporation, Jules O. Vollbehr, employed by the importer for 40 years, has been wholly corroborated by the testimony of Dr. H. W. Toelle, chief chemist and manager of the same corporation, and other evidence of record. It has been nowise discredited or impeached by any credible testimony given by either of the witnesses called in behalf of the Government in this case. The witness Vollbehr explained that appellant, A. Maschmeijer, Jr., Inc., does an annual business of approximately two million dollars, and has bought and sold more cornmint oil, Japanese mint oil, Brazilian mint oil, or "Japanese peppermint oil" than any other firm in the United States.

On direct examination by Mr. Rode, counsel for appellant, the witness Vollbehr, among other things, gave the following uncontroverted testimony:

Q As a buyer of both peppermint oil and cornmint oil, do you distinguish between the two oils? A Oh, yes. I would say like day and night, because the one, cornmint oil, practically the only use for cornmint oil is for the extraction of menthol, because it is so rich in menthol. Peppermint oil, they require for a pleasant aroma.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q Do you agree that peppermint oil is the volatile oil obtained by distilling the oil, mentha piperita? A Yes, sir.

Q That is your understanding of peppermint oil? A That's right.

Q Do you agree that cornmint is the oil distilled from the mint, mentha arvensis? A That's right. I saw the plantations [in Brazil] when I was many times there. I saw it from the beginning to the end, until the time it was to be distilled.

Q That is your understanding of the term peppermint oil and cornmint oil? A That's right.

Q Now, would you say the trade understanding of those terms is the same as yours or different? A Well, in Brazil where I was buying—

Q I mean in the United States? A In the United States, the same, yes. When somebody asked for peppermint oil, he gets American peppermint oil. If somebody asked for cornmint oil, he gets that. It is two different things.

Q Would cornmint oil be a good delivery for peppermint oil? A I would say no, because they are not the same; not what you ask for.

Q Do you know whether or not you are permitted to use cornmint oil for the same purposes as peppermint oil? A Absolutely not. We had to sign affidavits that we would use the cornmint oil imported from Brazil only to manufacture menthol and every by-product would be destroyed, which we did.

Q Are you a chemist? A I studied chemistry.

Q And, you have handled these two oils in substantial quantities? A That's right.

Q Is it possible for you to tell them apart readily? A That's right, by smelling.

Q If one was offered to you as the other, you would not take it; you would know it right away? A Right away. I would hold him liable for misbranding.

Q Have you ever known Japanese peppermint or cornmint oil or Brazilian mint oil to be offered to you by anyone in the trade as peppermint oil? A No.

No question of commercial designation, or that the imported merchandise was a distilled or essential oil, not containing alcohol, and no question of long administrative practice was involved. The court, based upon the record and contentions of respective counsel, reached the following conclusion:

We think a fair summation of the situation is that there are two separate and distinct oils of commerce, having different physical and chemical characteristics, uses, and prices, both the oil derived from *Mentha piperita* and the oil derived from *Mentha arvensis* being known and recognized commonly and scientifically as peppermint oil. We are satisfied that in the trade and commerce of the United States both varieties of oil bear the name peppermint oil (although the oil derived from *Mentha arvensis* is also known as cornmint oil), and that in order to determine which is meant, some modifying or qualifying words are used, either the adjective form of the name of the country of origin or the botanical source.

Since the tariff designation in issue is "Oils, distilled or essential: * * * peppermint * * *," without any words of modification or qualification, we conclude that it embraces both varieties of peppermint oil, from which it follows that the oil here in question was correctly assessed with duty by the collector.

It is conceded here that the imported oil differs from peppermint oil in all of the essential respects hereinbefore described in the decision of the trial court. Appellant contends, however, that the merchandise in issue is not, in fact, peppermint oil, nor is it commonly or commercially known as such, and that the court below in so holding not only resorted erroneously to the legislative history of the involved provision, but also in rendering its decision misapplied a valid rule of customs litigation to a situation which nowise existed in the case at bar.

Government counsel do not contend that the term "peppermint" oil is ambiguous, but merely claim on the point presented that under certain cited Summaries of Tariff Information, Surveys, and Supplements thereof, to which the court was referred, Congress and the makers of the trade agreement intended to include in the term "peppermint" oil the dementholized cornmint oil in issue as one of the essential oils specially provided for by paragraph 58, citing, for example, as did the trial court, the Summary of Tariff Information, 1929, at pages 295–297. In rebuttal appellant relies upon the same publication and quotes from page 298 thereof regarding paragraph 58 to the following effect:

Imports.—*Included among the essential oils not specifically provided for are* amber, cajeput, juniper, orris, *cornmint,* pine needle, and vetivert oils, *for which import statistics are available.* (Italics supplied.)

It should be noted here that paragraph 58 specifically provides for peppermint oil but not for cornmint oil. In that connection appel-

lant refers to the definition of peppermint oil defined in the following excerpt from Notes on Tariff Revision, 1909, at page 49:

*Peppermint oil* is an essential oil distilled from the peppermint plant (*Mentha piperita*). The oil is in increasing demand for medicine confectionery, chewing gum, toilet articles, and fine pharmaceuticals. During the last ten years the yield of American peppermint oil has averaged annually from 150,000 to 400,000 pounds. More than three-fourths of all the true peppermint of the world is produced within a radius of 75 miles of Kalamazoo, Mich. The plant is also cultivated to some extent in Ohio, Indiana, and New York, while England, Japan, China, and other countries are producers.

The language of the Summary of Tariff Information, 1929, relied upon by the Government and quoted in the decision of the court below, describes and compares peppermint oil and Japanese mint oil and discloses that the latter is used entirely in the making of menthol. The conclusion cannot be drawn therefrom that one oil is but a form of the other.

The trial court in rendering its final judgment obviously relied upon the same rule of customs law which counsel for the Government expressly cites and relies upon here to the effect that the dementholized cornmint oil in issue is and was for tariff purposes a variety of peppermint oil and dutiable as peppermint oil for the stated reason "that an *eo nomine* statutory designation of an article, without limitations or a shown contrary legislative intent, judicial decision, or administrative practice to the contrary, and without proof of commercial designation, will include all forms of said article."

The rule as just quoted was laid down by this court in the case of *Nootka Packing Co., et al.* v. *United States,* 22 C. C. P. A. (Customs) 464, 470, T. D. 47464. There clams, washed, cut into small pieces, cooked, and canned were imported, and this court held, citing authorities, that the mere mincing, cleaning, or cooking of clams did not remove them for tariff purposes from the *eo nomine* statutory designation of clams.

The lower court in reaching its conclusion, and Government counsel in the prosecution of this appeal, have likewise had recourse to the case of *Merck & Co.* v. *United States,* 24 Treas. Dec. 824, T. D. 33463. There imported coffee decaffeinated to the extent of approximately 80 percent, which had undergone no other change either in form, shape, structure, or character was classified under the statutory *eo nomine* provision for "coffee" by the Customs Court for the stated reason that:

The adulteration of an article, unless it constitutes a refining or manufacturing of a raw material, does not change its classification for tariff purposes. Many commodities as they are imported come in various grades and degrees of purity, and yet if they are specifically provided for in the tariff law, and there is no qualifying provision with reference to grade or degree of purity, they are all alike classified under that specific provision. * * *

There is no occasion to question the validity of the quoted law enunciated in the case just cited nor in the law promulgated to the same effect by this court in the case of *Nootka Packing Co., et al.* v. *United States, supra.* See *Calif-Asia, Ltd.* v. *The United States,* 39 C. C. P. A. (Customs) 133, C. A. D. 475, Appeal No. 4669, decided concurrently herewith. However, in the instant case the imported article is not peppermint oil in an adulterated form, or otherwise, but is an entirely different article. As hereinbefore set forth in the decision of the trial court, the imported cornmint oil is one of "two separate and distinct oils of commerce, having different physical and chemical characteristics, uses, and prices."

The Government here contends that in addition to the so-called legislative history of the statute the common meaning of the term "peppermint oil" includes the imported cornmint oil as a form of "peppermint" oil. Appellant relies entirely upon the common meaning of the respective terms "peppermint" and "cornmint" and argues that in providing for "peppermint" oil there was no legislative intent, express or implied, to include dementholized cornmint oil within the meaning of the term "peppermint" oil.

With respect to the genus of the plants here in issue, The New International Encyclopedia, Vol. XIII, at page 573, states:

Mint, *Mentha.* A genus of plants of the natural order Labiatae; * * * The species are perennial herbs, varying considerably in appearance, but all with creeping rootstocks. * * * The species are widely distributed over the world; some of them are very common. Water mint (*Mentha aquatica*) grows in wet grounds and ditches, and cornmint (*Mentha arvensis*), which abounds as a weed, in European fields and gardens. * * * Peppermint (*Mentha piperita*), a plant of equally wide distribution in the temperate parts of the world, is very similar to spearmint * * *.

The Encyclopedia Britannica, 1947, Vol. 17, at page 498, records the following derivation of the herb "peppermint":

Peppermint, an indigenous perennial herb of the family Labiatae, and genus *Mentha* (*see* Mint), the specific name being *Mentha piperita*, is distinguished from other species of the genus by its stalked leaves and oblong-obtuse spike-like heads of flowers. It is met with, near streams and in wet places, in several parts of England and on the European continent, where—as also in the United States—it is cultivated for the sake of its essential oil. * * *

In Webster's New International Dictionary, Second Edition, 1949, the following definition is noted:

peppermint, *n.* 1. A pungent and aromatic mint (*Mentha piperita*) with dark-green lanceolate leaves and whorls of small pink flowers in spikes. 2. The volatile oil obtained by distilling the herb; * * *.

The same lexicographer in the same edition of Webster's New International Dictionary, page 594, sets forth the following definition.

Corn mint. A European mint (*Mentha arvensis*) found in cornfields and naturalized in North America.

Other dictionaries may be cited which, without exception, show that "peppermint" oil means oil derived from the species of mint universally known as "*Mentha piperita*" and that cornmint oil means the oil derived from the species of mint universally known as "*Mentha arvensis*."

The following testimony of the witness Vollbehr was admitted without objection in evidence with respect to the differences between the two varieties of mint oil produced in Japan:

By Mr. Rode:

RQ I read you a statement from an article, "Technical Bulletin No. 378, United States Department of Agriculture, by A. F. Sievers, senior biochemist, and M. S. Lowman, assistant biochemist, Division of Drug and Related Plants, Bureau of Plant Industry, Comparison of Oils from Japanese Mint and Peppermint."

Chief Judge Oliver: What page are you reading from?

Mr. Rode: Page 6, at the top.

By Mr. Rode:

RQ (continued) "The oils distilled from the Japanese mint and peppermint differ in two important respects which determine their relative usefulness for certain purposes. (1) Japanese-mint oil contains, when produced under favorable conditions, from 75 to 85 per cent of menthol, of which up to 90 per cent is usually present as such, while the remainder occurs in combination as esters. Peppermint oil, on the other hand, contains approximately only 50 per cent of menthol, this also being present largely as such. (2) peppermint oil has the pleasant, aromatic flavor that has long been accepted by the consumer as the characteristic peppermint flavor, whereas Japanese-mint oil is described as harsh and lacking in the fine bouquet that distinguishes the other. This so-called bouquet is due to the combined effect of several other constituents present rather than to the menthol, although the latter is responsible for the peculiar 'cooling' sensation associated with the peppermint flavor. These important differences in the character of the two oils determine the uses to which each has been put and have under normal conditions, prevented the substitution of the one for the other." Do you agree with those statements? A Entirely.

RQ Would you say that Dr. Sievers and the other men who edited that were recognized authorities in this country? A Yes, sir, and they brought all the knowledge up to date.

Mr. Rode: May I offer the volume in evidence?

Mr. Martoccia: No objection.

The Government's case was tried upon the erroneous assumption that the imported merchandise is, as a matter of fact, not a species of mint oil but a species of peppermint oil, although there has been no dispute whatever throughout the litigation that the oil in issue was produced in Brazil from the plant *Mentha arvensis*. Mr. Martoccia, of counsel for the Government in the trial of the case in the court below, persistently cross-examined appellant's witnesses Vollbehr and Toelle on that basis, as disclosed by the following illustrative excerpts from Vollbehr's testimony:

XQ Is mentha arvensis a variety of peppermint oil? A Mentha arvensis is a variety of mint oil.

XQ   And, spearmint is a variety of peppermint?   A   I would say also of mint oil.

XQ   It is a variety of peppermint?   A   No, it is a variety of mint oil.

\*          \*          \*          \*          \*          \*          \*

XQ   Now, Mr. Vollbehr, isn't Mentha Arvensis a variety of a different kind of peppermint oil than Mentha Piperita?   A   No.

XQ   All right.   Let me read from——

Chief Judge Oliver: Wait a minute.   Let him finish his answer.

A (continuing)   Mentha Arvensis is a distinctive oil.   It belongs to the species of mint, like Brazilian oil.

By Mr. Martoccia:

XQ   Isn't it a form of peppermint oil?   A   No, it is a form of mint.   I saw the plants growing [in Brazil which were] different from the American plants.

Basing their position on certain quoted statements from page 66 of the Summary of Tariff Information, 1920, Government counsel concede here "That Congress was cognizant of the fact that Japanese peppermint oil was produced from a plant other than Mentha Piperita, and that such oil did not meet the standards required by the United States Pharmacopoeia."   If all of the rigid regulatory provisions issued in 1923 by the United States Department of Agriculture [4] to protect the good reputation of the American peppermint oil by the close supervision and control of imported cornmint oil are any criterion, a certain element of the trade may have found it profitable to promote the idea that the so-called imported "Japanese peppermint oil" includes the real peppermint oil produced principally in the United States.   That is particularly true, as the record shows the oil from "Mentha piperita sells for about twice what the mentha arvensis [oil] sells for."

As stated on this point in the March 1940 edition of the publication "Drug and Cosmetic Industry":

The importation of Japanese oil to America is permitted under the name of "cornmint oil," but genuine American oils which are adulterated with Japanese oil must bear the inscription, "Perfumed with cornmint."   In addition to this the American importer of Japanese oil must render account to the Government of what becomes of the oil.   \*   \*   \*

The liability for misbranding cornmint oil as Japanese or Brazilian "peppermint oil," to which the witnesses Vollbehr hereinbefore made reference, is the liability fixed many years ago by Congress in the enactment of the federal food and drug laws, particularly the Food, Drug, and Cosmetic Act, whereby no one can legally label or deal in Japanese or Brazilian mint oil misbranded as "peppermint oil." [5]   No instance has been cited whereby Congress has taken more careful precautions to identify and ostracize an imported misbranded

---

[4] United States Department of Agriculture, Service and Regulatory Announcements, Bureau of Chemistry, No. 28, pages 35, 36 (S. R. A. Chem. 28, Issued February 14, 1923).

[5] Federal Food, Drug, and Cosmetic Act, Ch. V, Secs. 501 (b) and 502, 52 Stat. 1049-50, 21 U. S. C. § 351 (b) and § 352, and Ch. VIII, Sec. 801 (a) and (b), 52 Stat. 1058, 21 U. S. C. § 381 (a) and (b), and the regulations issued thereunder, found in 21 C. F. R. § 1.309 to § 1.312, inclusive.

148

product to prevent its palming off by an importer as a substitute for the genuine article. Such legislative effort clearly may be considered with respect to the classification of the imported product.[6]

The overwhelming weight of the evidence in the case at bar is to the effect that the two different species of the oils in issue may have been produced at one time or another, and perhaps side by side, in various countries of the world; that the United States for many years has been the principal source of the supply of true peppermint oil derived from the plant *Mentha piperita*; that for years Japan was the principal source and importer to this country of cornmint oil derived from the plant *Mentha arvensis*; that during World War II and from 1939–1945 Brazil supplanted Japan as the principal and practically exclusive source thereof; that sporadic efforts, partially successful, were made in this country to encourage the production of cornmint oil from the plant *Mentha arvensis*; that because of the different purposes for which the respective oils were used in commerce, an export and import business between the United States and Japan, and later Brazil, for the respective oils, developed between such countries; that the cornmint oil brought in from Japan acquired to a certain extent "in the old days" the misnomer "Japanese peppermint oil"; and that such misnomer or misbranding has been continued to a certain extent and in violation of the laws of the United States with respect to cornmint oil imported from Brazil.

One factor recorded by the court below in reaching its conclusion that the imported cornmint oil was known in the trade and commerce of the United States as a variety of peppermint oil was the testimony and documentary evidence submitted by the Government's witness, the broker Poons, who sold and offered for sale in 1943–1945 certain merchandise under the name "Brazilian dementholized peppermint oil" obtained from the plant *Mentha arvensis*. Poons stated he was familiar with no regulations or requirements of the Government as to the labeling or branding of that particular type of oil or the use to which it is dedicated. Had Poons and his importer complied with the provisions of the Food and Drugs Act of the United States with respect to the appropriate branding of the imported merchandise, his testimony would have been worthless.

The Government in its brief takes the position here that "In the case at bar, it is submitted that the imported merchandise may not have been peppermint oil as interpreted by the Pure Food and Drug Act, yet it is peppermint oil for customs purposes." Neither the Government nor the court below has cited any case, and obviously there is none, whereby an article may be incorporated as a form of and included within the *eo nomine* provision in the tariff act for another separate and distinct article having different physical and

[6] *United States* v. *Bosch Magneto Co.*, 13 Ct. Cust. Appls. 569, T. D. 41434.

chemical characteristics, uses, and values. Certainly failure to comply with the Food and Drugs Act can effect no such result. It is true, as the court below pointed out,[7] that the tariff act was enacted by Congress for a purpose different from the purpose of the Food and Drugs Act. That should not blind the court, however, to the serious requirements of our national interest defined by the legislation last mentioned.

The requirement of certain further affirmative disclosures were necessary in the eyes of Congress to prevent deception of prospective purchasers in this country with respect to imported peppermint or cornmint oil. The trial court held "that in order to determine which is meant, some modifying or qualifying words are used, either the adjective form of the name of the country of origin or the botanical source." The court might have noted also that such identification is explicitly required by the provisions of the Tariff Act of 1930, as amended by section 304 of the Customs Administrative Act of 1938,[8] 19 U. S. C., sec. 1304.

In construing the meaning and scope of statutory provisions in order to determine the legislative intent or purpose thereof, every effort should be made to construe the same so that they will be consistent with other expressions of legislative intent on the same subject found in other laws so that all such enactments may be carried into effect without conflict. *L. Heller & Son, Inc., et al.* v. *Federal Trade Commission*, 191 F. (2d) 954, 956–957.

For the reasons stated, the judgment of the United States Customs Court is *reversed* and the case *remanded* for further proceedings not inconsistent herewith.

---

[1] C. A. D. 477.

[7] Citing *Merck & Co.* v. *United States*, 24 Treas. Dec. 824, T. D. 33463.

[8] Section 304, so far as pertinent, reads:

(a) Marking of Articles.—Except as hereinafter provided, every article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article. * * *